Good morning, Your Honors. My name is M. Katherine Jones, and I'm representing the appellant, Lynn Noyes. It's a pleasure to be here today. I'd like to address the time at the end for rebuttal. All right. You can watch the clock. I'll try to help you. This case concerns religious discrimination in a small office of the international company Kelley Services. That office was located in Nevada City, California. And the employees there were regular full-time employees of Kelley who did a variety of tasks, including software development. The boss of the Nevada City shop was William Prince. He was a member of the Fellowship of Friends, which is a religious group located in the small town of Organ House. Noyes was not a member of the Fellowship. The Fellowship of Friends is not a social group, as Kelley would like you to believe. The Fellowship of Friends, according to our expert, is a destructive cult whose members are deeply devoted to the group and its leaders, often to the exclusion of every other practical consideration in their lives, including supposedly fair employment practices. Can I ask you a question about your complaint? Yes. You alleged diversity of jurisdiction also? Yes, we did. Did you allege the jurisdictional amount? Over $50,000. Or $75,000. $75,000 at the time. Over $75,000, yes. State court. Yes, we did, Your Honor. And what would be the amount? You know, how would you? Because she didn't get a different job. She didn't lose her job, right? Right. So how would you come up with the $75,000? Well, it was a failure to promote initially, which resulted in she was being paid less because she wasn't promoted. How much less? I don't know off the top of my head, Your Honor. In the end, the person who got the promotion continued working at Kelley while she was laid off. So he was employed for another year or two after my client lost her job. As it turned out after the complaint was filed? In the layoff, it was based on? They ended up closing the shop, Your Honor. The Nevada City site is no longer Kelley Services. And so the one of your claims for damages would have been that if she was in the other job, she would have? Continued working for a longer period of time. And what was her salary? He was making the person who had the – who got the promotion approximately $60,000. Is her claim – there's several things that are interwoven here. Is her claim solely that she wasn't promoted to the manager position? Or is she also claiming that when the other gentleman was hired and brought in, or there was one person brought in at a higher salary because he needed it for his lifestyle? Is that a separate claim?  It just shows the disparate treatment that she suffered because she was not a member of the fellowship. He was paid more than she was, and he got a $10,000 raise right off the bat. She never made as much as he did. And the real claim – I think the real damage goes to the issue that she was never a manager. And she doesn't have that on her resume at this point. It's impacted her ability to get a job in management. She went to school and got an MBA in order to do the type of work that she was qualified to do. And, Kelly, she was qualified to do this software management position, which she did not get. So if you've made out a prima facie case, and if they've now come back with a statement as to legitimate reasons, so then it shifts back to you on the pretext issue, what do you think are the factual issues that would need to be resolved so that it wouldn't be appropriate on summary judgment, as you argue? First of all, we have challenged the alleged business reason on a number of grounds set forth in my brief, including the fact that it was Maya Bonhoeff who was supposed to have been the person who promoted Mr. Yielson to the manager position. But Ms. Bonhoeff had been told by Heintz, the boss of the shop, that my client was off the table, wasn't to be considered for that job. So we're, first of all, claiming that that recommendation in and of itself was tainted or wasn't based on actual facts. There's a section of the district court's order which I think is instructive and answers your question. The district court himself wrote at page 221 of the excerpt of record, Since Heintz was responsible for the decision to promote Yielson, evidence that he told others Noyes was not interested in the position and showed a preference toward Yielson in prior employment decisions could support a finding that Heintz did not select Yielson for promotion based on the non-discriminatory reasons articulated by Bonhoeff. That's the district court's finding. We agree with that finding. But the court has already found that there's a genuine issue of material fact. But inexplicably, the court goes on to require us to give more to prove our case and says that that evidence, however, does not support a finding that Noyes was passed over for promotion specifically because she was not a member of the fellowship. This is the wrong test. And on summary judgment in particular, we've already showed that there's a genuine issue of a material fact. Another question I have in this regard, how does it figure into the analysis where I recognize that there was a statement out there that she didn't want to be or wasn't interested in being a manager. And so in the one circumstance when they're going out to promote someone, they offer the job first to a person who's not a fellowship member. Yes. And then there's some discussion about, well, we have to be careful to look like we're, I guess, not discriminating, I think was the word they used. So they offer it first to a non-fellowship member. Then that person doesn't want it. Is that correct? I believe I covered that pretty well in my oral argument to the district court on the other day. But Hines knew that Ms. Walker wasn't going to take the job. I don't believe that's speculation. I believe that's due to the fact that she had previously had that position, and she told Hines that she felt it was a step backwards. I think that's true. So your argument there would be at least there's an inference of subterfuge about the offer? There is no subterfuge in this whole case. It's a very complex situation. Mr. Hines used others to promote his fellowship agenda. He didn't consult Maya Bonhoeff when he offered the job to Donna Walker. He just did when he was trying to show, when he saw that Maya, because he had, because Mr. Hines had told Maya Bonhoeff, Maya Hines didn't want the job, Maya suggested he deal with the fellowship member who was ultimately promoted. Mr. Hines saw that and used that to affect his agenda. He would use people. He was a very clever and manipulative person in promoting his idea that the fellowship, you know, should get the preferential treatment at the workplace. We have more evidence. I think there's compelling numbers in this case. The fellowship is just a small minority of any group you care to name except for the commune they have over in Oregon House and the number of workers at Kelly Services in Nevada City. The evidence, just the numbers, but you don't even need an expert to explain. The undisputed facts are that when Ms. Noyes filed her lawsuit in 2002, 9 out of 15 employees on her floor were in the fellowship. In early 2003, 13 out of 35 full-time employees in Nevada City were in the fellowship. I just don't understand how this case could not get to the jury on this. Is there evidence in the record as to what the population of Nevada City is and what the population of the fellowship is? No. There's no evidence as to the population of Nevada City. I'd make an offer of proof. We have about 2,500 people in our town. It's a very small town. The fellowship doesn't hasn't taken over our town. They're in Oregon House, which is an even smaller town in a neighboring county. And the fellowship has about 2,000 members worldwide. But of the worldwide population, that's just a tiny percentage. I know the district court had trouble with our supposed statistics in saying we didn't have an alternate population group. But it's just a comment. I'm asking, I would be asking a juror, just as a regular person, to explain to me why 13 out of 35 people were in the fellowship in this group. The fellowship is just a tiny minority of any group. Nevada City or even Yuba County. I don't know about Oregon House because it's very rural. They probably have, you know, a few hundred people makes a difference there. If this case were to go back, and this is just, you know, hypothetically, is discovery closed? Discovery is closed. And we are at the point of our expert witnesses. And we have, we've identified our experts, but they have not yet been deposed. Discovery is not closed except as to the experts. There was evidence that the other side presented that there were five or seven other managers who were not in the fellowship. And therefore, you know, our numbers lose value. Backing up to the earlier question, the judge did not allow the Heinz's deposition in or the experts' declaration. Of the cross. Yeah. On trial, would the deposition be in? Oh, yes, Your Honor. We did complete Heinz's deposition within the required period. It was just because of his, he failed to show for his last deposition. And we didn't get it done in time to use it to oppose the motion for summary judgment. But it was done within the time to use it for trial. It was within the discovery cutoff period. As is Rick Ross. Rick Ross was within the expert discovery period. Rick Ross is the expert. So for trial, there's no issue? No. If it goes back for trial, those would? Those are basically in terms of if the appeal were remanded, we wouldn't need to reach those issues. Is that correct? On the, right. On the admissibility of the Rick Ross declaration, correct. Because he's an expert witness. He would be our expert. Well, let me ask you this. You've obviously made an argument that you think your view is that there is sufficient genuine issues in the term of fact. Issues of fact here presently. So I take it your argument that you don't need, in your view, Mr. Hines' deposition to establish a genuine issue of fact. Is that correct? That's correct. We didn't have it for the motion for summary judgment. Even without that deposition, we should have been able to show that there were those issues. I don't think that Hines was that important at that point. He is going to be an important witness in the end. But it was the last time he didn't show for his deposition. I remember his opposing counsel saying he didn't think he had a good reason either for not showing. It was really, it was poor form. But even, be that as it may, it's not really an issue before your court today. So that you haven't appealed on that? No. Not on the deposition of Hines. Because we'll use it at trial if we get that far. I think we have plenty of evidence, as it is. And I believe the district court. But I thought you did appeal the fact that it should have been allowed. Was the Rick Ross declaration that we said? And the deposition. Motion for reconsideration. That is correct. So you did appeal. I mean, part of your appeal is the failure to permit the Hines deposition to be used at summary judgment or not. Are you dropping that? I don't believe it's essential. It is part of our appeal, though. Okay. Well, it sends us down a lot of paths. You know, if things aren't essential to the appeal, we're left with trying to sort out how it fits into the structural aspect of the appeal. So you're basically saying that you're dropping that aspect of the appeal. I would like that, Your Honor. The Hines deposition. We have a lot of evidence. I mean, not only the minority issue of the fellowship membership, but, you know, the falsity of Kelly's reasons for not promoting my clients. William Hines's state of mind is very important. And we can establish that without his deposition here. I believe I have. He's lying to people. He's lying to my client. We have deposition testimony that he was lying to Ms. Bonhoff about my client's interest in the management position. His motives and his credibility are something that can only be evaluated by a jury. You've got to see him in action, I think, to understand what was going on here. And I also believe the effect of fellowship membership and what it means to be in that organization is also important, and the jury needs to weigh that. And the judge took all that out of the jury's hands. The cases hold, do hold that issues of credibility, including questions of intent, have to go to the jury. And a plaintiff in an employment discrimination action need produce very little evidence to overcome a motion for summary judgment because of the elusive fact of intentional discrimination. It's rare that you have direct evidence of that. And I would like to point out that the State cause of action, State law causes of action such as a breach of contract and covenant of good faith and fair dealing, intentional infliction, those remain viable because of the diversity jurisdiction. And I don't want to drop that issue. The district court's order should be reversed and the case should be remanded for trial on the merits. Do you have any further questions? I'd like to reserve a few minutes for rebuttal. You can reserve the remaining time for rebuttal. No, you have five minutes and 22 seconds. Good morning, Your Honors. Joe Conanton, Paul Plevin Sullivan and Conanton from San Diego. Could I ask you about the diversity claims? Well, it didn't seem to me that the district judge dealt with that at all. He essentially let them go. And so, at a minimum, doesn't the case have to go back at least to try those claims? I don't think so, Your Honor. I don't think the issue was even adequately briefed for this Court. The issue of whether or not the trial court should have used the Sullivan jurisdictional or the other issues, I don't know that was before, Your Honor. But as to the specific issue of whether there was enough pled the amount in controversy or whatnot, I don't believe there's a sufficient record on that issue for the review. Well, that's right. So he dismissed those claims on supplemental jurisdiction because he found against the plaintiff on the Federal claims, right? I believe that's correct, Your Honor. Isn't that wrong, because he didn't deal with diversity jurisdiction? I don't know, but I don't believe that there's a record sufficiently developed on that to answer that question. Well, that would be a point. I mean, if he only – if he – the only thing I can see is that he dealt with supplemental jurisdiction 1367. The plaintiff says there's diversity jurisdiction, although I can't find the pled jurisdictional amount in the complaint. Maybe I'm missing it. But it would seem to me that the district court would have to deal with that, wouldn't it, because jurisdiction is something that the court needs to consider? I guess that's conceivable, Your Honor, but I don't believe that issue has been teed up or presented here, and I don't know that that would be an appropriate grounds for this Court to remand for that issue, given that it's been on the record. Well, I read that as an appealed issue that the district court would have to deal with. I believe it may have been mentioned in passing at the very bottom of the initial brief, but there was no discussion, no authority, no citation regarding the issue of the courts. Well, I mean, tell me – you know, tell me this, okay? It's in the brief, we read it, we all thought it was an issue. You don't have – if – the only issue is if did the judge need to look at all the grounds for jurisdiction before dismissing it. Do you have any authority that says the judge didn't need to do that? No, Your Honor. I haven't thought that issue entirely. So if it went back on that point, basically, the two of you would then be arguing over whether or not there's diversity jurisdiction, correct? And amount in jurisdiction – and amount in controversy, I would think. Well, that's part and parcel of whether there would be – whether the Court would even have jurisdiction. Right. Okay. But I guess the issue I was going to raise is that this may be the unusual case where I don't think we really disagree on what the law is. I mean, the law is relatively straightforward on this. Well, the district judge said that not only did they have to show pretext, but they also had to show that the pretext was for discriminatory reason. I think what the district court was – That is incorrect, right? Well, what I think – For summary judgment. I think the district court got it right but may have not explained it as well as he should have. What the law is, is that you need to show pretext, but then you need to have – but you need to have specific and substantial evidence of pretext. So you – it's not enough to just have a prima facie case. You need to have your prima facie case and then specific and substantial evidence of pretext as to whatever that decision was. It's not just discrimination in the air or pretext in the air. It is that – What's your best authority for what the standard is that the plaintiff needs to meet for pretext? I would think Reeves is even – Reeves, I think, is a good case, or at least helps when you take Reeves and Godwin and Coleman and all of those authorities. Even the cases that plaintiff relies upon, Chuang and Ratt, they all get us to the same place, sometimes in meandering ways. But the issue is not, I think, as Ms. Noya's counsel was saying, that there are issues of fact. There will always be issues of fact. It is, are there issues of material fact? Well, why isn't it a material fact that – that Hines is telling people that she's not interested in this promotion? And if she's not interested in the promotion, of course, then why would one even consider her for the promotion? It's a good question, and it goes to, I think, the heart of the case. What – what Appellant is saying is this is a taint case. It's a taint case. Okay, the reason is legitimate, but the reason you got to that reason was illegitimate. There was something that filtered in that made that recommendation improper, and therefore, you can't rely upon that recommendation. Essentially, that's where we are. But here, the underlying facts that this recommendation, the Bonhoeff recommendation, that's where this all comes down to. This manager recommends this person for the job, and we say we hired this person because he was recommending it. But there's no taint there. There's an argument, yes, he was saying she wasn't interested in this job, or Hines was – Why is that a question of fact? I mean, it seems to me that you could make a good jury argument just as you've made now, but to get to agree with you, I think you'd need to decide that what she's telling us is just – is just not true. Because there is no issue of fact about what the recommender knew and when she knew it. That, I think, is the key fact for the panel. What she says is – But the fact that what the recommender knew and so forth doesn't deal with the question of what Hines, who made the appointment, what the reason for his making it was, and there is evidence that he had told both of those other supervisors that she didn't want the job. I understand, Your Honor, but there's no evidence that the reason that the company gave this recommendation by this person isn't the actual reason. And there's no evidence that that recommendation is tainted. I guess that's the point. Well, how about the inference that can be drawn from the fact that he had told that to the two supervisors and that that would be part of their reason for – Bonham's reason for recommending? I think that would be the perfect example of insubstantive and insubstantial evidence going to the ultimate fact that it does not show that – What is the ultimate fact in your mind? The ultimate fact is that the company put this person in this position because he was recommended by an impartial, non-fellowship partner. That's the fact. And there's no evidence, at least not direct, not specific, not substantial evidence that that recommendation was somehow a cover-up for some sort of grand conspiracy or anything like that. It doesn't have to be a grand conspiracy. It's just a question of whether the – Hines, who was the one who made the appointment, whether he was doing it in a way that was tainted by the fact that he had told these two supervisors that she didn't want the job. I think I understand, Judge Hubb, but I don't think there's evidence of that, Mr. Rucker. That, I think, is the distinction. What isn't there evidence? There is evidence that he had told both Bonham and Galvin that. So there's evidence of that. But there's no evidence that he said anything to Bonham about that or that she knew anything about that before she reached her own independent conclusion that Jason was involved in it. Didn't she say – didn't Bonham say that had she known that Lynn – I think the quote is, had I known that Lynn was not interested, I would have gone upstairs and said, hey, Lynn, meaning, hey, Lynn, you know, put your name in for this. But directly after that, she also says, I stand by what I did. I did the right thing. I absolutely – But doesn't she admit that before she made the recommendation, she thought that Lynn, the plaintiff here, was not being considered? She says that she – she didn't know – she didn't think that Noyes was – On the table. Was on the table. But at the time she made the recommendation, it didn't – that wasn't impacting her thinking. She came to the conclusion that Jason was the guy. But didn't she make that conclusion at a time that she didn't have all – you know, it's like if you look at what's going on in college football. You say, okay, who's the best team? And they say, don't look at this one team. And they pick a team. It's not the same if they considered all the teams. And so here, Bonham didn't consider all the potential people. She picked the person that she thought was the best from who she thought was available. I respectfully disagree on that, though, Judge Moskowitz, because she had the – she knew all of the people that were available. And she has said, even after thinking, oh, even if this person was available, this was the right thing. So it is – there's no issue of her saying, at least in this record, had I known Noyes was available, I would have done something much different. Well, I mean, don't people normally say, look, had I known that, I still would have reached the same decision because they're kind of emotionally or intellectually tied to the decision they made. But let's go on through. There's another factor. One of the things he said to the EEOC or the FEHP was that it was a consensus and there were so many other people. And then they put on evidence that some of those people said, well, I never said this. I don't know that that is exactly what the record says. I think what it says is Ms. Bonham says, yes, there was a meeting where these issues were discussed. And the other people say, I don't remember. And there's the – briefly on the issue of a party not remembering a particular issue doesn't create a tribal issue, in fact. So, you know, I don't know that that's a big dispute of factors. It clearly was some sort of a meeting. Now, whether or not it is a true consensus meeting or not, I don't know. Maybe that's just people's perception. But at the time of the consensus meeting, they thought that Noyes didn't want the job. So they really wouldn't have thought about her or considered her. I don't know that the record has actually developed on the issue whether it says that or not. Well, isn't what she needs to show – I mean, one of the ways that a plaintiff is permitted to show the pretext issue is where you have an internally inconsistent statement as to the reason for the job description. And that comes right out of all the Supreme Court cases. So it seems to me that's precisely what you have here. It may be an inconsistency that could be explained with further testimony or it may be an inconsistency that is real. I don't know. But it seems to me that our question is not to figure that out but to see if there really is an inconsistency, at least as alleged and as supported by her testimony and some testimony by Bonhoeff and Noyes, then the whole point is that we're not supposed to sort that out on summary judgment. It seemed to me that what the district court did, it would say, yeah, we have this, but I'm still going to grant summary judgment. I don't – I'm not quite sure, Your Honor, that I see where the inconsistency is, though. And I take issue with the fact that there really is no inconsistency regarding the reason why things were done as they were done. I mean, there may be a – there's certain – What was the – in your view, what was the reason? The reason for the promotion of Jielson. Jielson was promoted because he was recommended by a non-fellowship person and then after – and he met the qualifications for that particular job at that particular time. That was the reason. So the – see, what I'm concerned about is that you're placing all the emphasis on whether there is an issue with regard to Bonham. There would – maybe – maybe there was a recommendation there that was genuine, but that doesn't mean that that was the reason that Hines actually made the promotion. There are all these other matters concerning his telling people that she really didn't want the job and so forth that would indicate that regardless of whether Bonham had made the recommendation, he was going to promote Jielson rather than Noyes. And I would respectfully submit that there is not specific substantial evidence that the reason he gave is the actual reason. And that's what I believe the plaintiff would need to show in order to – No, inferences. You can use inferences. It doesn't have to be specific evidence. Reasonable inferences from the evidence that was subpoenaed. Absolutely, Your Honor. But if you look at those cases where the courts draw inferences, you look at Reeves where there's a statement that the decisionmaker said something like, you're so old you came over on the Mayflower, or you look at the Radd case where the executives say something about, I don't know, we already have two chinks or something awful like that. And you look at the – you know, Radd was the case where she was told, you don't get this job because of your accent. And when you go – Chuan wants to go to a case where the executives made a different comment. In those situations, of course, inferences should absolutely be drawn, but not in a situation like this. No, the difference between those cases and others is that those cases have the kind of evidence that you don't see that often, which is just straight-out discriminatory comments. And we all know from reading the cases that it happens, but more often than not, people are pretty smart. I'm not saying you're quite discriminated or not. I don't know. But I'm just saying, in general, people are pretty smart, and they've gotten a little more sophisticated than they used to be. So they don't say things like, you're a chink, I won't promote you, or you're not a fellowship member. Instead, there are other kind of sub rosa inferences. And you don't need the kind of evidence that was in Reeves in order to have a summary judgment. You cannot. No doubt. But when you look at it in context here, where this person, the alleged discriminator who's trying to put this other person of his religion in this job, offers the job to somebody else who's not even in the group first, and there is no evidence, no admissible evidence that that was improper or some cover-up of any kind. Okay. Let's can we – I just want to make sure I'm giving a fair look at the evidence. The noise lawyer says that there's evidence that Hines knew that Walker wouldn't take the job. There's no admissible evidence of that in this record. Okay. Well, we'll ask Ms. Noyce, counsel, to tell us, because she made the statement and I wanted to follow up with you. Mr. Farley, that she had that job before and therefore she wouldn't want it again, but that is the perfect example of speculation, of conjecture. There's no evidence that this was some setup so that he could show that he offered it to somebody else. And when you have a record of – Is that woman making more money in her new job? I don't know the answer to that. Do you know whether her new job was considered to be at a higher level, whether or not she was making more money? I don't. Okay. All I know is the record shows her saying or Hines saying that she perceived it to have been a step-down and therefore that's the reason why she gave – that she didn't want it. Did she? Wait, wait, wait. So Hines said – I think. It was either Hines or Walker. I'm not sure. But there is in the record that the reason why she declined that job was that she perceived it to have been a step-back or something like that. So why wouldn't a fair inference be from that, that because he's trying to say, look, we've got to do something so people don't look like we're discriminating, he hires – he offers it to somebody for whom it would be a step-back? I think that's the height of speculation, saying he offered somebody a job. Well, you – you seem to draw the idea that something is speculation when what we're looking for is legitimate inferences. So I think you should address whether there's a permissible inference or not and not just dispose of it as speculation. In that situation, Your Honor, I don't think there's a legitimate inference to say that there is an inference of discriminatory intent because the job was offered to someone who perceived it to be a step-down. And that would be the leap that Your Honors would need to make. But didn't he say that – didn't Hines say, look, we've got to be careful because people will think if I give it to Fellowship people, I'm discriminating? I don't know that there is record of that. There was. There certainly is, which I think is extreme. Wait a minute. Is there – is there or is there not evidence along those lines? There is, particularly regarding Jielson. When – when Bonhoeff says, I think we should hire Jielson, he says, I don't know. I don't think we should do that. That – I know there have been issues. We need to be careful about that. That's the perfect example of nondiscriminatory intent. But why wouldn't we also draw an inference from the fact that Noyes had an MBA, who had six years' seniority over Jielson, in fact, hired Jielson, is my understanding, and yet Jielson was picked? It's a great point, Your Honor. Except that the needs for this particular job were not academic in nature. The record shows what they needed was a consensus builder. What they needed was someone with skills to adapt and heal a relatively fractured group of people. If this were a situation where you were merely comparing what people's paper looked like, I guess, perhaps. But there's no evidence in this record that an MBA would be helpful for someone in the first place. But what evidence do we have that the person who was needed was someone who would heal or that there were all these controversies that had to be healed? I'm sorry, Your Honor. I just don't understand. What evidence is there that there was a problem that had to be healed and that he was the man to heal it? I think the evidence is Legion. And particularly in the Bonhoeff Declaration, I believe it's in the excerpts between — both in her deposition testimony and the excerpts, probably between pages 7 or 8 through pages 12 or so. That's exactly what it lays out, Your Honor. What's what? That the group had gone through a difficult time. The group was under a lot of stress. The group was fractured. And that what the highest need of that group now was someone who could guide, heal, and otherwise be acceptable to the entire group and give them a more nurturing environment. I see that my time is just about up. I respectfully ask that this Court affirm, and if there are any further questions, I'll be happy to answer. Can I ask you one last question? There's some insinuation that Jielson had to have this job or he would be forced to leave the country. What's that about? The record reflects that Jielson — oh, the leaving the country thing I'm not sure is developed. The money part is that he had received a job from another company and had gone. I meant about the leaving the country. Was he a U.S. — I take it he wasn't a U.S. citizen. I don't know the answer to that, Your Honor. I'm sorry. And so did they need to keep him — did they need to give him a job to keep him in the country? I don't believe that's the record. I'm not sure of that. Okay. It's argued, but we'll ask Plaintiff's counsel. Thank you. Thank you very much. Thanks very much. A lot of the fellowship members are from Europe, and they have to keep up their work requirements in order to stay in this country. And when Jielson was hired, my client was part of that hiring team. She knew his resume, and she knew, you know, he was European. She knew that he had a degree in social geography. That's in the record under her declaration. Later, when Heinz tried to tell her that Jielson had a design — a degree in instructional design, she knew that to be false. He was spinning falsehoods to support his position that the fellowship would be promoted. Just briefly, I guess, when you know the issue of whether or not Bonhoeff knew that my client was interested in the management job, I think if you go back to 2000 in the Mario Fantoni promotion, excerpt of Record 9394, Ms. Bonhoeff testifies in that deposition that — the question, did William Heinz ever say anything to you about Lynn Noyce's interest in the operations manager position? This was the 2000 one prior to the one at issue. Yes. What did he say? He indicated that he thought she wasn't really that keen on being a manager, and he felt her skills were better used elsewhere. So it goes back to that.       And just a little bit on the question of the interests of the fellowship, independently concerning Jielson, she had in her mind the prior incident in 2000 concerning my client's alleged lack of interest in management career. Donna Walker, the one to whom the job was initially offered, excerpt of Record 85, which was Heinz's document, where she said it was a step backwards. I think it is appropriate to draw an inference that he knew that that's what she would think. She had already had that job. She had been given another job, and she didn't want to take that other job back. Do we have, other than the short reference to step backwards, do we have anything about the pay grade or the title or anything else? As far as the management group alleged consensus, I think the only evidence of this being a group decision is on the record, is from William Heinz. He's the one who's saying that the managers who were supposedly involved in this decision didn't recall or didn't think it was such a big deal. He brought it to them as a done fact. I'm thinking of putting Jielson in this position. And they said, well, okay. And I think I covered that pretty well in my reply brief at pages 8 and 9. The important thing, I think, is the inferences are important. A false reason alone can be enough to infer discrimination. We have a lot more than that. But I think the district court made an incorrect conclusion when it said that we need to show both that the reason was false and that discrimination was the real reason. We don't need both. All we need is substantial evidence showing that there is at least an inference. And as Your Honor pointed out, I don't believe that it's very common anymore to have direct evidence of discrimination. And I don't think that's required. That's not required. Did you have any other questions? I think not. Thank you. I thank both counsel for your arguments this morning. The case of Noise v. Kelly Services is submitted.
judges: Hug, McKeown, Moskowitz